DENNIE J. TAYLOR, EMPLOYEE, PLAINTIFF v. CONE MILLS CORPORATION, EMPLOYER AND LIBERTY MUTUAL INSURANCE COMPANY, CARRIER, DEFENDANTS

No. 8110IC593

(Filed 16 March 1982)

**1. Master and Servant § 68— byssinosis not compensable under prior statute**

　　Byssinosis was not an "inflamation of the skin, eyes or other contact surfaces or oral or nasal cavities" within the purview of G.S. 97-53(13) at the time plaintiff became disabled on 5 January 1963 and thus was not an occupational disease for which plaintiff was entitled to compensation.

———————

**2. Master and Servant § 68— occupational disease—byssinosis—no coverage under Session Laws for disablement prior to 1 July 1963**

Chapter 1305, 1979 Session Laws, which provides that claims for byssinosis "which can be proved under G.S. 97-53(13) shall be compensable regardless of the employee's date of last injurious exposure," does not provide coverage for employees disabled from byssinosis prior to 1 July 1963, the effective date of the amendment to G.S. 97-53(13) adding infection and inflamation of internal organs to the list of occupational diseases.

Judge WEBB dissenting.

APPEAL by plaintiff from the North Carolina Industrial Commission. Opinion entered 31 March 1981. Heard in the Court of Appeals 4 February 1982.

Plaintiff's claim is for the occupational disease byssinosis. Plaintiff's work history showed that while he was employed by defendant Cone Mills, he was regularly exposed to cotton dust for about 13 years. His last exposure was on 4 January 1963. During his employment with defendant, plaintiff developed severe chronic obstructive lung disease and byssinosis, and suffered permanent injury to his lungs.

After the hearing, Deputy Commissioner Ben E. Roney, Jr. entered an opinion and award in which he concluded that at the time plaintiff became disabled on 5 January 1963, byssinosis was not a compensable disease, but that plaintiff was entitled to an award for permanent injury to his lungs, which injury caused a diminution of plaintiff's earning capacity. The conclusions of law entered by Deputy Commissioner Roney were as follows:

1. The coverage formula governing the rights and liabilities of the parties to this claim extends to "(i)nfection or inflammation of the skin, eyes or other external contact surfaces or oral or nasal cavities due to irritating oils, cutting compounds, chemical dust, liquids, fumes, gases or vapors, and any other materials or substances." (Citations omitted)

2. The respiratory surfaces of the lungs are not external contact surfaces of the body. The lungs are essential internal organs of respiration. (Citations omitted)

3. Claimant became incapacitated on 5 January 1963 to earn the wages he was receiving at the time thereof in the same or any other employment due to permanent injury to

important internal organs of the body resulting from byssinosis. . . . The coverage formula for occupational diseases extant on 5 January 1963 did not provide for payment of compensation for disability occasioned by byssinosis. . . . Claimant is, nevertheless, entitled to compensation for permanent injury to important organs of the body occasioned by byssinosis that may be reasonably presumed to have caused a diminution of his future earning capacity, the value of which is $7,000.00. (Citations omitted)

Both plaintiff and defendant appealed to the Full Commission. On review, the Commission, Commissioner Vance dissenting, modified Deputy Commissioner Roney's conclusions of law by striking the last sentence in conclusion number 3, and denied plaintiff's claim. Plaintiff has appealed.

*Smith, Patterson, Follin, Curtis, James & Harkavy, by Henry N. Patterson, Jr., Michael K. Curtis and Jonathan R. Harkavy, for plaintiff-appellant.*

*Smith, Moore, Smith, Schell & Hunter, by J. Donald Cowan, Jr., for defendant-appellees.*

WELLS, Judge.

This appeal presents two questions of law, as follows:

I. Is compensation payable under the Workers' Compensation Act to an employee disabled from byssinosis when the date of last injurious exposure and the date of disability occurred prior to July 1, 1963?

II. Does Chapter 1305, 1979 N.C. Session Laws provide coverage for employees last injuriously exposed and disabled from byssinosis prior to July 1, 1963, even if compensation is not otherwise payable under the Workers' Compensation Act?

The essential facts as to plaintiff's illness found by Deputy Commissioner Roney are not in dispute. The findings as to the nature and manifestation of byssinosis are set forth with such clarity, however, that we deem it appropriate to quote them as follows:

12. Byssinosis is a disease proven to be due to causes and conditions peculiar to and characteristic of employment in cotton textile mills. The precise identity of the offending agent is unknown. . . .

13. The pathology of byssinosis is essentially that of chronic bronchitis; i.e., inflammation of the small airways that conduct air to and from the alveoli. Mucous production and white blood cell recruitment occurs when respirable cotton trash dust falls onto the cells of the airways. Mediators are released, causing narrowing of the airways. An asthmatic like response results. Increase in body temperature and decrease in the capacity of the lungs to exchange gas are acute responses to exposure to respirable cotton trash dust.

[1] Plaintiff first argues that at the time he became disabled in January, 1963, byssinosis fell within the general definition of occupational diseases set out in G.S. 97-53(13), as the statute was then worded, as follows:

Infection or inflammation of the skin, eyes or other external contact surfaces or oral or nasal cavities due to irritating oils, cutting compounds, chemical dust, liquids, fumes, gases, or vapors, and any other materials or substances. (1935 N.C. Pub. Laws ch. 123, as amended by 1957 N.C. Sess. Laws ch. 1396, § 6.)

Plaintiff argues that the only medical evidence in the record on point classifies byssinosis as an inflammation of an external contact surface and of the nasal cavities. One of plaintiff's expert medical witnesses was Dr. Kaye H. Kilburn, whose qualifications are, briefly, as follows. Dr. Kilburn became Board Certified in Internal Medicine in 1963. From 1962 to 1969, he was an associate professor of medicine at Duke University, during which time he served as Chief of Medical Service at the Veteran's Administration Hospital in Durham. From 1968 to 1975, he was Director of the Division of Environmental Medicine at Duke University Medical Center. From 1973 to 1977 he served as Director of the Division of Pulmonary and Environmental Medicine at the University of Missouri — Columbia. At the time he gave his testimony, he was a Professor of Medicine at Mt. Sinai School of Medicine of the City University of New York. Dr. Kilburn's publications number more than one hundred, including a number of papers dealing

specifically with chronic obstructive lung diseases, including byssinosis, in textile workers. Dr. Kilburn has done extensive research on the causes and characteristics of byssinosis.

We believe that Dr. Kilburn's testimony on byssinosis is of such clarity that it would be helpful to bench and bar for us to take the unusual step of quoting it in substantial detail.

Byssinosis has its origins lost almost in antiquity. Evidently, all the time that man has used plant fibers — cotton, flax and soft hemp for clothing and rope making and so on, the processors of these materials have noticed an illness characterized by coughing and shortness of breath. Its classic description was made by Ramazzini in the 1700's in Italy.

Since that time it has been periodically, in a sense, rediscovered, and much of its history is from the Lancashire cotton mill area of England where Kay and Prausnitz did classic studies of it in the 1930's. In the 1950's the team of Schilling and McKerrow also did studies of this disorder which was caused by the breathing of textile dust in mills processing cotton. Interestingly enough, at that time and now, English mills largely process United States cotton.

The Schilling studies and the Hill studies demonstrated that there is an increased illness, chronic respiratory illness which culminates in early retirement for disability. So in England byssinosis has been a compensable disease since the early 1940's, and the requirements have become increasingly lenient.

First, they thought it took twenty years to develop a chronic disease, and then they thought it took ten years. And now I believe it is down to four or five years.

In this country, the experience with the disorder goes back about ten or fifteen years, although there were periodic papers in the 1940's and the early 1950's. Bouhuys and Schilling did a small study in Western North Carolina. I think it was 1961. Dr. Heaphy and I did a small study in Durham, North Carolina in 1963.

Then the substantial studies were begun in Gastonia in 1968 by Merchant and Reiss and Rausch and Harris and

Hamilton and myself and John Lumsden, from the North Carolina State Board of Health.

With the development of the vertical elutriator by John Lumsden and Jerry Lynch from the National Institute for Occupational Safety and Health, respirable dust could be measured. We then did an extensive study of over 3,000 workers at Burlington Mills in North Carolina between 1969 and 1972. The studies demonstrated that there was a linear response curve between respirable cotton dust, that is the cotton dust that can be taken further than the nose in the strained breathing air mask, and the symptoms of shortness of breath, coughing and sputum production.

That study was the basic data for the establishment of the cotton dust standard. This standard was adopted first by NIOSH as a recommendation and then by OSHA, more or less simultaneously with the development of this body of data which was based on clinical demographics and some chemical studies of people.

We studied the bract material, cotton dust material in experimental animals, and demonstrated that hamsters or rats could imitate the human response as far as showing nasal and respiratory leukocyte recruitment of airways.

Then we attempted to isolate various chemical agents from the bract material to see which one was the most responsive, and have actually come up with several candidates now for producing most or all of the picture of byssinosis.

The sentinel characteristic of byssinosis, like those of chest pains characterizing angina or heart disease, is the tightness in the chest, shortness of breath and the so-called Monday morning asthma that is not quite Monday morning because it tends to come on about noon or so of the first shift. People coming back after a weekend away from the mill experience that. That is the most characteristic and universal part of the disease.

Clinically, cough and sputum production is less common but also important. As people are chronically exposed, they develop small airway disease with continuous progressive

reduction of pulmonary function, particularly of expiratory air flow until they are disabled after usually several years of exposure.

The x-ray pattern is indistinguishable from normal. There are no x-ray characteristics of the disease. The pathology has now been studied by two or three responsible and careful groups, including Philip Pratt from Duke. The pathology is essentially that of chronic bronchitis, that is, there is inflammation of the airways of the lung, not of the alveoli, but of the conduit airways, particularly the small airways that conduct the air being breathed out into the alveoli.

This inflammation is characterized by excessive mucus production and recruitment of white blood cells and some proliferation of connective tissue, so that essentially the airways are functionally closed either by mucus plugs or by scarring after chronic exposure.

It is quite similar to the bronchitis caused by cigarette smoke, but sufficient people who don't smoke have been studied to determine that it doesn't require any kind of interaction between smoking. However, there is a positive interaction, but it is not required to cause the disease.

I will comment briefly on the relationship between byssinosis and cigarette smoking. In the studies which we did, which rest on over 3,000 men and women, there was a different dose response curve in the smoker than in the non-smoker. In other words, a given amount of cotton dust produced greater effect in smokers than in non-smokers.

This could be due to two possibilities: One could be that the smoker is more susceptible but that seems unlikely because usually smokers are on the other edge of the population. They are less responsive to irritating agents. So we noticed this, and I think it is generally thought by students of the disease that they are additives—that the damage done by cigarette smoke and the damage done by cotton dust add. We haven't quite translated years of card room exposure into years of cigarette smoking, but such a computation is certainly reasonable. I am not sure exactly what numbers to put on it, but there is a relationship, it is clear.

Byssinosis in its chronic form is disabling. It produces sufficient impairment of breathing that people find they can't do their usual job, particularly in the card room where the usual job is carrying and mounting laps on the carding machines which are 80 or 90 pounds of weight. This can incapacitate someone who could go on for many years as a doctor or a lawyer or a watchmaker, because the activity requirement there or in the spinning area requires a lot of activity. What it means is that a good many people by the time they are 50 years old or so—if that means they have had twenty years' exposure—are not only legally retirable, they even fulfill more stringent Social Security criteria for retirement for respiratory disability.

Byssinosis is a disease due to causes and conditions characteristic of employment in textile mills producing cotton. It is not a disease that the general public is equally exposed to, outside of employment in those areas. The only way the general public could be exposed would be if they happened to be in the effluent of a mill or cotton gin, or if they were in the atmosphere or air space of the workplace, which is in the mill. Cotton goods that have been dyed or washed or otherwise treated have lost their capacity to produce any kind of ill effect.

Card room employees are at much greater risk of having this disease than the general public. If one looks at the relative risk in the mill, the opening, picking, carding areas where the bales are broken and fluffed up with air and transported and carded (which is basically not only a fibre straightening but a trash removal operation) is where most of the exposure is.

In spinning, there is a lesser exposure, and I say this again based on our 3,000-worker study, and by the time you get to weaving, the average exposure is considerably reduced and may only be ten or twenty per cent as high. Much depends on, unfortunately, not only what is going on in the work area but where the air for that work area is coming from.

If it happens to be a large loft-like room with carding on one end and spinning and weaving on down in the edges of

the same room, then your weave room worker may have substantial exposure. It is a matter of the airborne material rather than the operation. But still, in general, where it is generated, the doses are highest, and on down the line the dosage of cotton dust goes down.

I have an opinion on whether or not byssinosis is an inflammatory process. It is an inflammation in the sense that that is a general scriptor for response by cells or tissues in the body to an extraneous environmental material. The inflammation of cigarette smoke I have already commented upon. Formaldehyde, which is a common enough chemical, or nitrogen dioxide, are inflammation-producing materials.

The cotton dust, besides being a primary inflammation producer which causes swelling of cells and leakage of fluid and recruitment of inflammatory cells from the blood, the leukocytes, also, because there is a particle, causes a certain amount of chronic response, and in that way resembles farmer's lung or even silicosis or asbestosis. The particles are digestible—that is, they are eaten and completely digested by the body cells.

I don't want to give the misimpression that it is like asbestosis or silicosis, but it shades toward those in an intermediate area between the noxious gases which are on one extreme, and the particles which are on the other extreme.

What I am really saying is it produces responses by the bleaching out of an active ingredient, and then by the nature of its being a particle, it has to be disposed of and it causes a further reaction.

I have done laboratory research in this particular area. Since 1970 we have had almost continuous interest in looking at the responses of cells in experimental animals, either isolated cells or isolated airways, or intact airways in the animal, or intact airways over substantial periods of time—15 days of exposure; 30 days of exposure. So, my opinion is based on both the modeling of the disease in the experimental animal, as well as the rather constant comparisons that we made with the human situation.

I have been asked if I have an opinion whether byssinosis is an inflammation of the skin or other external contact surface or of the oral and nasal cavities, as these terms are understood by physicians dealing with this condition. It does produce an inflammatory response in the conjunctiva of the eye and in skin areas such as the nose, external portion of the nose, and we have done an actual nasal swabbing from textile workers before and after exposure, and it has shown inflammatory responses.

There is a shift from the nature of the cells from being mononuclear to being the acute inflammatory response cells which are polymorphonuclear leukocytes. So that during a daylong, shift-long exposure, we were able to show that not only was there an increase in the recruitment of these cells into the nose, but there was an increase in inflammatory cells in the blood. There was an increase in body temperature, and this coincided in time to decreases in the FEV-1—in the forced vital capacity—so that in human cardroom workers, a panel of them which we studied, their response to dust manifested itself in the eye, nose, respiratory tract, below the nose, blood and then in overall lung function, as measured by the standard pulmonary function test.

That gave us considerable confidence that in fact it is the exposure to dust.

These were, of course, compared with control periods when one ran rayon in the same model cardroom or ran nothing at all and simply used the air filter system to ensure that particulates were not picked up somewhere else and carried in. That was work that has been published, so it has stood peer review by other scientists.

I have been asked if I have an opinion on whether byssinosis is also an inflammation of the external contact surface. I think it truly has to be considered, as we have for many years in the study of lung disease, that the entire respiratory surface of the lung is an external contact surface. That is what all our air pollution legislation is based on. There is solid experimental and epidemiologic evidence that though we have something in the neighborhood of one-half to two square meters of body surface which is skin, we have in

the neighborhood of 180 square meters or roughly the size of a tennis court of body surface, which is lung, and both are in the same intimate contact with the air which we walk around in and beathe. (sic) But one is 100 times as extensive as the other, so that plus the fact the lung is sort of one thin cell thick and the skin is many cells thick.

So, in terms of being responsive to environmental materials, whether they be natural or manmade, the lung is an external contact surface which is responsive to this material, whatever it be, that we get in this mixture which we breathe and call air.

On cross-examination, Dr. Kilburn described and explained some of the studies and theories associated with the recognition of byssinosis, the precise irritating agents in cotton dust, and the physiological changes in the respiratory tract associated with byssinosis, but he did not modify his opinion that byssinosis causes an inflammation of an external contact surface and of the nasal cavities and the eyes.

To begin our analysis of this case, we recognize the rule announced in *Wood v. Stevens & Co.*, 297 N.C. 636, 256 S.E. 2d 692 (1979) and affirmed in *Taylor v. Stevens & Co.*, 300 N.C. 94, 265 S.E. 2d 144 (1980) that plaintiff's right to compensation must be determined under the statute in effect at the time he became disabled, that date being 5 January 1963. The history of G.S. 97-53(13), as it then existed, was clearly and succinctly set out by Judge Hedrick in the opinion of this Court in *Wood v. Stevens & Co.*, 36 N.C. App. 456, 245 S.E. 2d 82 (1978), *modified and remanded* in *Wood v. Stevens & Co.*, *supra*, and we need not repeat it here. Plaintiff's first argument in this case depends entirely upon a determination of whether plaintiff was disabled by an "[i]nflammation of the skin, eyes, or other external contact surfaces or oral or nasal cavities. . . ." It first must be made clear that the undisputed finding that plaintiff was disabled by reason of byssinosis does not resolve the question before us. Although Dr. Kilburn's testimony that byssinosis can and does cause irritation of the eyes and nasal cavities is clearly competent to aid the Commission and us in discerning the legislative intent as to these terms, *Wood v. Stevens & Co.*, *supra*, the evidence in this case clearly fails to support any conclusion that plaintiff's disability

resulted from such an inflammation of his eyes or nasal cavities. On the other hand, the evidence does clearly establish, as the Commission found, that plaintiff was disabled by reason of the effects of byssinosis on his lungs. The dispositive question as to plaintiff's first argument is whether byssinosis manifests itself as an irritation of "other external contact surfaces" of the human body; or, put another way, whether the legislature intended that, as Dr. Kilburn put it, that the "entire respiratory surface of the lung[s]" be considered an "external contact surface", as those terms were used in the statute as of January, 1963. These terms are not technical and should therefore be construed in accordance with their common and ordinary meaning. *Williams v. Williams*, 299 N.C. 174, 261 S.E. 2d 849 (1979), and cases cited there. The key word is "external," and we construe its commonly accepted and ordinary usage to mean something capable of being perceived outwardly, something situated or relating to the outside or outer part of the object under consideration. *See* Webster's 3d New Int'l Dict. (unabridged). Our construction is supported by the fact that effective 1 July 1963, G.S. 97-53(13) was amended to include "internal organs" of the body, a term which clearly includes the lungs. *See Taylor v. Stevens & Co., supra.* Despite Dr. Kilburn's stimulating and enlightened testimony, we reject plaintiff's argument that Dr. Kilburn's present opinion, based upon the impressive research carried out by him and other experts in the study of byssinosis during the past ten to fifteen years, should be engrafted upon the legislative intent as that intent was manifested when the statute in question was enacted.

[2]   We next address the question of the effect of the enactment of Ch. 1305 of the 1979 Session Laws on plaintiff's claim. We quote that Act in its entirety:

AN ACT TO PROVIDE THAT BYSSINOSIS, KNOWN AS "BROWN LUNG DISEASE", SHALL BE DEEMED AN OCCUPATIONAL DISEASE WITH-IN THE MEANING OF G.S. 97-53(13) FOR PURPOSES OF WORKMEN'S COMPENSATION CLAIMS REGARDLESS OF THE DATE THE DISEASE ORIGINATED.

The General Assembly of North Carolina enacts:

Section 1. Claims for "brown lung disease", which can be proved under G.S. 97-53(13) shall be compensable regardless of the employee's date of last injurious exposure.

Sec. 2. This act is effective upon ratification.

Sec. 3. This act will expire April 30, 1981; however, this provision does not apply to any claims filed prior to April 30, 1981.

In the General Assembly read three times and ratified, this the 25th day of June, 1980.[1]

Plaintiff argues that regardless of whether he comes within the purview of the January 1963 version of G.S. 97-53(13), he is entitled to compensation by reason of the above Act. Again, we cannot agree. First we note that the date on which plaintiff's occupational disease "originated" — the operative term used in the caption to the Act — has no relevance to his claim.[2] It is the event of disability that triggers entitlement to compensation. G.S. 97-52; *Wood v. Stevens & Co., supra.* For the reason that the event of disability controls, neither does the date of plaintiff's last injurious exposure, — the operative words in Sec. 1 — standing alone, have any significance to the plaintiff's claim. In reaching this conclusion, we have considered the implications of the wording of the last paragraph of Chapter 965 of the 1963 Session Laws, the Act which amended G.S. 97-53(13) to include infection and inflammation of internal organs in the list of occupational diseases. That paragraph is as follows:

The provisions of this subsection shall not apply to cases of occupational diseases not included in said subsection prior to the effective date of this Act[3] unless the last exposure in an occupation subject to the hazards of such disease occurred on or after the effective date of this Act.

Disability being an event which would necessarily follow "last exposure," this paragraph has no effect on plaintiff's claim, whose disability pre-dated the effective date of the 1963 Act. For the same reason, Section 1 of Chapter 1305 of the 1979 Session Laws

1. Ch. 1305 does not enact or amend a General Statute and it is therefore not found in the compilation of the General Statutes.

2. Due to the insidious nature of byssinosis, it is unlikely that it would ever be possible to establish the date such a disease originated.

3. 1 July 1963.

does not operate to have any effect whatsoever on plaintiff's claim.

For the reasons stated, the opinion of the Industrial Commission is

Affirmed.

Judge MARTIN (Robert M.) concurs.

Judge WEBB dissents.

Judge WEBB dissenting.

I dissent from the majority. I cannot agree that the words "external contact surface" have no technical meaning. Dr. Kilburn testified that the respiratory surface of the lung is an external contact surface. As I understand his testimony, this is so because this surface is in intimate contact with the air around us which we breathe. Since the testimony was that byssinosis is an inflammation of the airways of the lung caused by inhaling cotton dust, this would be an inflammation of an external contact surface which would make the plaintiff's disease compensable under G.S. 97-53(13) as it existed in 1963. I believe the Industrial Commission should have so found. I vote to reverse.